625 So.2d 7 (1993)
Philip J. SNYDERBURN, As Receiver of Sunland Mortgage Corporation and Philip J. Snyderburn, P.A., Appellants,
v.
Peter BANTOCK, et al., Appellees.
No. 91-2607.
District Court of Appeal of Florida, Fifth District.
September 3, 1993.
Rehearing and Rehearing Denied October 13, 1993.
*8 William M. Rishoi and Philip J. Snyderburn, Snyderburn, Rishoi & Swann, Winter Park, for appellants.
Frank D. Upchurch, Jr., Upchurch, Bailey & Upchurch, P.A., St. Augustine, Michael Kahn, Kahn & Kahn, P.A., Melbourne; C. Thomas Tew, Tew & Garcia-Pedrosa, and Barton S. Sacher, and Nancy J. Van Sant, Hornsby, Sacher, Zelman & Stanton, P.A., Miami, for appellees.
Rehearing and Rehearing En Banc Denied October 13, 1993.
GRIFFIN, Judge.
Philip J. Snyderburn, P.A. and Philip J. Snyderburn ("Snyderburn") appeal an order refusing enforcement of an attorney's charging lien against settlement proceeds held by Hornsby, Sacher, Zelman and Stanton, P.A.[1] and Kahn & Kahn, counsel of record for plaintiffs below. We affirm in part and reverse in part.
This fee dispute arises out of the business activities of Sunland Mortgage Corporation and its president, James B. Mimbs. In early March 1984, Sunland and Mimbs were under investigation by the state comptroller's office for alleged state and federal securities violations. In connection with this investigation, Sunland and Mimbs retained Glenn Padgett and his law firm, Kinsey, Vincent, Pyle, P.A. ("KVP"), to advise and represent them. Padgett and KVP represented both Sunland and Mimbs from March 1984 until at least April 1985.
Philip Snyderburn, a former director of the Florida Division of Securities, was an attorney in private practice in Orlando. Beginning as early as 1982, he had been consulted *9 by Padgett concerning legal matters involving securities law that affected various of Padgett's clients.[2] According to Padgett, he consulted Snyderburn concerning his representation of Sunland on as many as eight occasions between April 1984 and April 1985. Padgett also contended that in certain of these conversations he sought and obtained advice concerning his own personal conduct or that of KVP and he considered that an attorney-client relationship existed between Snyderburn and himself. Snyderburn contends that his conversations with Padgett were, at most, of a general nature. Snyderburn did bill Padgett for "consultation" on at least one occasion in April 1984 and was paid by the firm.
On April 11, 1985, Padgett contacted Snyderburn and asked him to render an opinion concerning the legality of Sunland's activities. Snyderburn consulted Tom Tew, a lawyer in the Miami office of the firm of Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey ("Finley, Kumble"), to get legal advice concerning Padgett's request. He was advised to get a specific representation agreement that would allow Snyderburn to disclose his findings to the appropriate authorities. Snyderburn prepared an engagement letter which stated:
We have been retained by the Company as special investigatory counsel to determine the assets, liabilities, expenses and revenues of the company (Sunland) and to determine what action, if any, is to be taken in order to preserve the assets of the Company for the benefit of its creditors. Such action to be taken may involve the notification of certain State and Federal regulatory agencies.
The engagement letter was reviewed by Padgett and Mimbs on behalf of Sunland on April 12, 1985. It was signed by Mimbs on behalf of Sunland.
After Snyderburn reviewed Sunland's books and records, and had discussions with Padgett, Mimbs and another Sunland attorney, Richard Whittington, Snyderburn apparently concluded that Sunland was engaged in an illegal "Ponzi" scheme and had engaged in the fraudulent sale of unregistered certificates of deposits and other securities. This opinion was conveyed to Padgett and Mimbs by a final report on April 14, 1985. Snyderburn claims Padgett asked them whether he should notify his malpractice carrier, but Snyderburn told him he could not advise Padgett because he did not represent him.
The following day, Snyderburn notified the Comptroller's office in writing of his findings and recommended the appointment of a receiver for Sunland's assets. On April 16, 1985, the Comptroller filed an injunctive action against Sunland and Mimbs in Brevard County Circuit Court and sought the appointment of Snyderburn as Sunland's receiver. Snyderburn asserts that, prior to accepting the appointment, he obtained from Mimbs a written waiver, which also advised him that civil and criminal actions could be instituted against him for the sale of the illegal securities. Apparently,[3] the waiver was prepared by Padgett but was executed only by Mimbs. The same day, Snyderburn was appointed Sunland's receiver.
Four months later, in August 1985, Snyderburn obtained the court's permission to file a malpractice action (the "corporate action") as receiver of Sunland against a number of professionals who had previously rendered legal and/or financial advice to Sunland and/or Mimbs, including Padgett and KVP. The order recited that neither Sunland nor Mimbs, nor the related entities, had sufficient funds to prosecute the malpractice action on behalf of the corporation; accordingly, a contingency fee equal to 20% of the sums recovered through trial was authorized to be paid to Snyderburn's firm.
Three months after the corporate action was filed, in November 1985, Padgett's attorneys met with Snyderburn. They advised him that because Snyderburn had previously *10 represented Padgett, he was bound to respect Padgett's attorney-client privilege, and asserted that ethically Snyderburn could not represent Sunland against Padgett. Padgett's attorneys also threatened to file a third party complaint against Snyderburn alleging that any error on Padgett's part was caused by Snyderburn's own failure to provide Padgett, KVP and Sunland with competent legal advice concerning Sunland's compliance with state and federal securities laws. Snyderburn disagreed that he had any conflict of interest and allegedly "showed (Padgett's attorneys) the door." Padgett did not thereafter seek Snyderburn's disqualification or sue him.[4] Instead, over the ensuing ten months, his attorneys filed a series of motions to dismiss Sunland's complaint for failure to state a cause of action. After Padgett obtained dismissal of the third amended complaint, Snyderburn appealed the final order. This court ultimately affirmed the dismissal of the corporate action on June 16, 1987.[5]
During the pendency of Snyderburn's appeal, a number of Sunland's individual investors engaged their own counsel, Michael Kahn ("Kahn") of Kahn and Kahn, P.A. Snyderburn claims he suggested to Kahn that the investors might consider their own action and he recommended Finley, Kumble. On or about March 16, 1987, while the appeal in the corporate action was still pending, Finley, Kumble entered into an agreement with the investors to prosecute a lawsuit on their behalf (the "Bantock litigation") and to receive a 30% contingent fee for prosecution of their claims.[6] As a part of the same fee agreement, Finley, Kumble, in turn, undertook to retain Kahn and Snyderburn. Snyderburn agreed that, in lieu of hourly receivership fees and his contingent fee in the corporate action, he would accept 12% of the Finley, Kumble contingency fee. Under the agreement, Snyderburn was required to continue to fulfill his duties as receiver, including continuing to prosecute the corporate action to its conclusion and to assist in the Bantock litigation on an as-needed basis.[7] Barton S. Sacher ("Sacher") became the Finley, Kumble lawyer principally responsible for the suit.
In April of 1987, shortly after the circuit court granted Snyderburn's motion to approve this new fee agreement, the Bantock litigation involving almost six hundred individual investor plaintiffs was filed. As in the earlier corporate action, the primary defendants were the attorneys, certified public accountants and investment advisors who had rendered advice to Sunland. Among the named defendants were Padgett and KVP.
On August 11, 1987, Padgett and KVP filed a motion to disqualify Kahn and Finley, Kumble in the Bantock litigation because of their contractual association with Snyderburn. The motion alleged that Padgett and KVP had retained Snyderburn to "render legal advice and assistance" to them with respect to their representation of Sunland and Mimbs, and that Snyderburn had rendered such legal assistance and advice between April 4, 1984 and sometime in 1985. The motion alleged that an attorney/client relationship existed between Snyderburn and Padgett/KVP because of Snyderburn's representation of them, and that the attorney-client privilege arising out of the relation had not been waived by Padgett or KVP. The motion further alleged that Padgett and KVP had learned on or about March 31, 1987[8] that Snyderburn had agreed to assist counsel of record in their prosecution of the investors' action, in return for which Snyderburn was to receive 12% of any recovery in the *11 investors' action. Finally, the motion alleged that Snyderburn had a clear conflict of interest in representing the investors in their action against Padgett and KVP by virtue of his prior representation of Padgett and KVP, and that Snyderburn's confidential knowledge was "imputed" to Kahn and Finley, Kumble.
Sacher opposed Padgett's motion to disqualify Finley, Kumble and Kahn because of its association with Snyderburn. In a memorandum filed with the court, he argued that (1) Padgett had presented no facts warranting disqualification since Snyderburn was not counsel of record and his involvement in the litigation was tangential and related solely to his receivership activities; and (2) in any event, Padgett and KVP had waived any right to disqualify plaintiffs' counsel since they had waited more than two and one-half years to assert the privilege with respect to Snyderburn. Attached to the memorandum were affidavits signed by Sacher, Kahn and Snyderburn.
Sacher met with Snyderburn the night before the hearing on the motion for disqualification and asked Snyderburn to relinquish his 12% fee. Snyderburn alleges that the basis of the request was Sacher's assertion that Snyderburn could not testify at trial in a case in which he had a contingent fee interest. Sacher gave Snyderburn a legal memorandum prepared by an attorney with Sacher's firm which suggested this conclusion. Snyderburn agreed to a written waiver in which he agreed to relinquish his contingency fee in the investors' action.[9] Snyderburn asserts that Sacher assured him that notwithstanding his waiver of a contingent fee, he would be compensated for his services.
The motion for disqualification of Finley, Kumble and Kahn was heard on November 13, 1987. Sacher argued principally that Padgett had waived his right to seek disqualification by not objecting to Snyderburn's acting as receiver or prosecuting the claims against Padgett and KVP for over two years. He explained that the reason Snyderburn had an interest in the contingent fee was:
[B]ecause of the earlier relationship he had with the investors through the Receivership, which he waived in favor of a new agreement so some funds could be provided to provide costs so this case could go forward.
On December 4, 1987, without determining whether any attorney/client privilege had been waived as between Padgett, KVP and Snyderburn, the court concluded as a matter of law that Padgett and KVP had waived the right to seek disqualification of plaintiffs' counsel.
Within days of the hearing on the motion to disqualify, Snyderburn decided that an attorney could testify in a case in which he was entitled to receive a contingent fee, as long as he was not acting as an advocate at trial. Snyderburn asked Sacher to reinstate the contingency fee, but Sacher refused, although he allegedly assured Snyderburn that he would receive some type of compensation. At the same time, Snyderburn's partner, William M. Rishoi, requested a written opinion from the Florida Bar concerning whether an attorney could receive a contingency fee in a case in which he may be called as a witness.
After Snyderburn received a favorable opinion, he again asked Sacher to reinstate his contingency fee but Sacher did not respond to the request. Instead, apparently at Sacher's instigation, the lower court approved a stipulation between the investors and Padgett which provided:
A. With respect to those conversations of Mr. PADGETT and Mr. Snyderburn between early April, 1984, and July 25, 1984, which may have taken place during which Mr. PADGETT sought personal legal advice from Mr. Snyderburn related to actions of Mr. PADGETT and his firm respecting their posture in these matters  as opposed to the advice sought and/or used by them in the representation of their clients, the Sunland/Dolphin family of companies and Mr. MIMBS . .. Mr. PADGETT and his firm may assert the attorney-client privilege on subject matters relating *12 to any personal legal advice sought and/or received.
In July 1989, Sacher filed a motion to compel Snyderburn to turn over the remaining funds in the receivership estate for prosecution of the investors' action. Snyderburn had refused to disburse the funds because of concerns that his firm would not be paid. On August 11, 1989, Snyderburn, Sacher and Kahn agreed to certain disbursements from the receivership to both Sacher's and Snyderburn's firms. They agreed that their fee dispute would be determined at the conclusion of the investors' action, if they were unable to reach an earlier settlement. Finally, they agreed that the disbursement of fees to Snyderburn's firm was not "a waiver or an admission of any rights" concerning the dispute.
Between 1989 and 1991, Snyderburn continued to serve as receiver of Sunland. In February 1991, Snyderburn learned that the investors had settled with certain of the defendants. Thereafter, on February 21, 1991, Snyderburn filed a notice of charging lien for 12% of any recovery by the investors. Sacher and Kahn filed a motion to strike the charging lien as a sham, maintaining that Snyderburn was not entitled to any fee generated by the litigation; Snyderburn responded by filing a motion to adjudicate the charging lien. Thereafter, the court held hearings on the validity of the charging lien. In its final order, the court made the following findings of fact:
1. In March 1984 Glenn Padgett was retained as an attorney for Sunland Mortgage Corporation and James Mimbs concerning an investigation by the State of Florida's Comptroller's Office.
2. Glenn Padgett sought legal advice from Philip J. Snyderburn concerning that representation on the following dates:
(a) April 4, 1984
(b) April 23, 1984
(c) April 26 or April 27, 1984
(d) Two or three times in July 1984
(e) April 11, 1985
(f) April 12, 1985
3. The claims in the subject lawsuit concern activities of Glenn R. Padgett during that time frame in the course of his representation of James B. Mimbs and Sunland Mortgage Corporation.
4. Glenn R. Padgett sought and received legal advice from Philip J. Snyderburn during the aforementioned dates which he followed.
5. Philip J. Snyderburn never sought permission from Glenn R. Padgett to file a law suit against him.
The court ruled that Snyderburn's November 1987 waiver of receivership fees was invalid because it was involuntary or, alternatively, was not supported by a valid consideration. It further found that all the elements of the charging lien had been proven. However, relying on Junger Utility & Paving Co. v. Myers, 578 So.2d 1117 (Fla. 1st DCA 1989), the court nevertheless refused to enforce the charging lien, ruling that:
[T]o enforce this charging lien would ratify a breach of the duty of loyalty owed to Glenn R. Padgett by Philip J. Snyderburn. Acting as a court of equity on this charging lien, the Court will not enforce it because allowing Philip J. Snyderburn to collect a contingency fee would violate Rule 4-1.9 Rules of Professional Conduct and he who seeks equity must come to court with clean hands. A violation of a rule of professional conduct may be condemned by honest and reasonable men and would be a basis to deny relief by a court of equity. Roberts v. Roberts, 84 So.2d 717 (Fla. 1956).
Snyderburn has appealed this order; no cross-appeal was filed.
The court's ruling is a narrow one; it does not purport to deny Snyderburn's legal right to collect monies pursuant to his fee-sharing contract. It merely finds that the equitable remedy of a charging lien on the proceeds of the litigation over which the lower court had jurisdiction is not available to Snyderburn because, as urged by Sacher and Kahn, Snyderburn had violated a Rule of Professional Conduct.
We begin our analysis by accepting the lower court's findings of fact. The first of the court's legal conclusions based on its *13 findings of fact is that Padgett did not waive Snyderburn's violation of the conflict of interest prohibition contained in Rule 4-1.9. It is unclear whether the court concluded there was no waiver because the rule does not admit waiver except by "consent after consultation" or whether the court did not find a waiver in the facts presented.
If there can be a waiver resulting solely from a former client's failure to promptly seek disqualification of his attorney after being fully informed of the facts,[10] as distinguished from an implied acquiescence in the lawyer's undertaking to act on behalf of a new client in violation of Rule 4.1-9, this case would qualify. There can be no question that by November 1985 Padgett was fully aware that Snyderburn and his firm were prosecuting litigation against him and that Snyderburn rejected Padgett's claim that an attorney/client relationship existed between them. Yet, having full knowledge of the adversarial posture of his former counsel, Padgett made the election not to seek Snyderburn's disqualification. As Sacher himself argued in opposition to Padgett's 1987 motion to disqualify Finley, Kumble and Kahn:
[A]ny such claim has been waived by inaction for two-and-one-half years. By failing to assert any claimed prejudice from Mr. Snyderburn's involvement in these matters as the Receiver of Sunland, the Padgett Defendants are now estopped from asserting any such claims now.
The lower court agreed:
[W]ithout determining whether any attorney client privilege has been waived in this cause, the Court concludes as a matter of law that Glenn Padgett, Kinsey, Vincent, Pyle, P.A., and Philip Snyderburn, Esquire, waived its right to seek disqualification of Plaintiff's counsel because it failed to seek disqualification of Philip Snyderburn in Sunland Mortgage Co. v. Berman, Shapiro, et al., Case Number 85-7820-CA-B, and as the Motion to Disqualify other counsel of record for the Plaintiffs is derived from the same basis as that concerning Philip Snyderburn having privileged information that may be shared with co-counsel, waiver of that right to disqualification of Philip Snyderburn is dispositive of this Motion of Disqualification (Jackson v. J.C. Penney Co., Inc., 521 F. Supp. 1032) [sic] (N.D.Ga. 1981).
In Lackow v. Walter E. Heller & Co. Southeast, 466 So.2d 1120 (Fla. 3d DCA 1985), the court indicated that a waiver by inaction could preclude a later filed motion to disqualify but remanded to determine when the conflict became known. More recently, in Balda v. Sorchych, 616 So.2d 1114, 1116 (Fla. 5th DCA 1993), we refused to quash an order denying disqualification because the petitioner had delayed for three years in asserting the existence of the conflict. The case before us, however, is more like the Junger case relied on by the lower court in one particular respect. In Junger, as here, the conflict and the objection were promptly brought to the attorney's attention, even though it appears there may have been some delay in filing a motion to disqualify. 578 So.2d at 1120. The Junger court found no waiver had occurred. Id. at 1119.
In this case, Padgett promptly contacted Snyderburn and asserted the conflict. As in Junger, we conclude Padgett was not required to file a motion to disqualify Snyderburn in order not to waive his objection to Snyderburn's conduct. Perhaps, as asserted, Padgett's decision not to seek disqualification in the first case was based on a belief that the case lacked merit and could be most quickly disposed of by other means. Perhaps Padgett was unconcerned when Snyderburn's firm was alone in pursuing a negligence cause of action on behalf of the corporation, but had very different concerns when he became associated with other counsel prosecuting a securities case involving six hundred plaintiffs. We do not decide whether the right to seek disqualification of counsel could be waived through excessive delay because of unfair prejudice that might accrue to the innocent successor client if the attorney who has handled his or her case for a long *14 period of time is forced to resign, because this is not such a case. In the Bantock litigation, Padgett brought his conflict claim and his objection to the attention of Sacher and Kahn promptly, this time by filing a motion to disqualify.
We are bound to conclude that Snyderburn's conflict was not waivable merely by Padgett's failure to seek disqualification in the corporate case. The ethical rule is designed for the benefit of the client. After he learned in 1985 that his former attorney had sued him, Padgett timely informed Snyderburn that an attorney/client relationship between them had existed and that he did not consent to Snyderburn's firm prosecuting a claim against him in a substantially related matter. He was obliged to do no more. The ethical obligation was on Snyderburn, and this notice to him should have been enough. Snyderburn at that point was bound either to obtain consent to represent the corporation against his former clients or to withdraw. Or, if he was in doubt about his status, he should have gotten his obligations determined at the outset. The one thing he could not do was convert his client's failure to seek disqualification into consent.
We hold that, after informing Snyderburn of the conflict, Padgett and KVP's failure to seek disqualification in the corporate action did not waive the conflict. The lawyer has his own obligations and cannot merely go his own way until his client takes steps to stop him. See EZ Paintr Corp. v. Padco, Inc., 746 F.2d 1459 (D.C. Cir.1984). Given the lower court's earlier erroneous order that waiver was the basis for Sacher and Kahn's entitlement to act as counsel for the Bantock plaintiffs, and given that Sacher/Kahn have demonstrated in this case an acute concern for ethical rectitude, we recognize this holding may impact their own circumstances.
Snyderburn next contends that even if there were no waiver of the conflict by Padgett, Sacher/Kahn have no right to set up this violation of an ethical duty owed by Snyderburn to Padgett to defeat Snyderburn's equitable enforcement of his fee claim against Sacher/Kahn. The dilemma we face was well expressed in a recent opinion by Judge Alan Schwartz:
It is ironic indeed that the Code of Professional Responsibility  which is designed to raise the professionalism of the practice  has been employed to lower the responsibilities of attorneys toward each other below even the "morals of the marketplace." (citation omitted).
Robert A. Shupack, P.A. v. Marcus, 606 So.2d 466, 470 (Fla. 3d DCA 1992) (Schwartz, C.J., dissenting).
It is worth noting that Sacher/Kahn did not contend in the lower court that a violation of Rule 4-1.9 was a basis to deny Snyderburn's claim; rather they urged a violation of Rule 4-1.7. Perhaps they themselves perceived that, in order to defeat Snyderburn's claim, they would have to show a violation of an ethical duty owed to them, not one owed to Padgett. Nevertheless, Sacher/Kahn have readily adapted to the lower court's ruling, urging that, "however the conflict was labelled, the Bantock plaintiffs proved a prima facie violation of 4-1.9 at the hearing before the court below ..." and that the court's findings of fact do establish the violation of 4-1.9. We agree with these two assertions by Sacher/Kahn. This does not dispose of the issue, however.
In Mark Jay Kaufman, P.A. v. Davis & Meadows, P.A., 600 So.2d 1208 (Fla. 1st DCA 1992), the court refused to deny a charging lien even though the lienor's claim was allegedly based on a fee-splitting contract that violated Rule 4-1.5 of the Code of Professional Responsibility. The court held: "[I]t is error to use an ethical rule as a basis to invalidate or render void a provision in a private contract between two parties." Id. at 1211.
Under the facts in Davis & Meadows, P.A., we do not disagree. There, both attorneys entered into the contract having (presumably) equal knowledge of the ethical issues, and the client was not affected. This case presents a closer question, however. We reject Sacher/Kahn's contention that they have standing to raise Snyderburn's conflict in defense of the fee claim against them because they are "officers of the court" and because such conduct is "fundamentally antithetical to the adversary system". We *15 also disagree that their status is in any way analogous to that of the insurer in State Farm Mutual Auto. Ins. Co. v. K.A.W., 575 So.2d 630 (Fla. 1991). On the other hand, a successor client, or even fee-sharing counsel, has some right to complain if they learn they have unknowingly retained a lawyer who has previously represented the successor client's adversary in the same or a substantially related matter.
Because we conclude that Snyderburn's conflict of interest in suing Padgett and KVP was not waived and that Sacher/Kahn are entitled to bring this matter to the attention of the court sitting in equity, we affirm the lower court's refusal to allow a charging lien on the proceeds of any recovery from his former clients, Padgett and KVP. The conflict of interest is no basis to deny Snyderburn a charging lien on any recovery from the other defendants, however. The doctrine of "unclean hands" can have no application to the defendants other than Padgett and KVP. A court of equity is not an avenger of wrongs committed at large; the other defendants have no involvement in this conflict issue and neither the Bantock plaintiffs, nor their counsel are unfairly prejudiced by enforcement of the fee agreement for a percentage of the settlement monies contributed by anyone other than Padgett and KVP. See Miller v. Berry, 78 Fla. 98, 82 So. 764 (1919). Equity will prevent Snyderburn from collecting a fee for the prosecution of claims against Padgett and KVP but not the others.[11]
AFFIRMED in part; REVERSED in part; and REMANDED.
COBB and PETERSON, JJ., concur.
NOTES
[1] This firm is evidently the successor-in-interest to Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, discussed infra.
[2] The record contains Snyderburn's letter to Padgett dated March 22, 1982 confirming his representation of Padgett's firm "in regard to certain securities matters that may arise in the future at the hourly rate of $100... ."
[3] The waiver itself is not a part of the record on appeal.
[4] In testimony, Padgett claimed that there was no need to move for disqualification because discovery had been stayed and he was able to obtain dismissal of each of the complaints filed by Snyderburn.
[5] Sunland Mortgage Co. v. Berman, Shapiro, Crawford and Co., 508 So.2d 1246 (Fla. 5th DCA 1987).
[6] At some point, it appears that Hornsby, Sacher, Zelman & Stanton, P.A. succeeded to Finley, Kumble's rights under this agreement. The transition has not been an issue in this case.
[7] Finley, Kumble's share of the recovery under the agreement was also 12% and Kahn was to receive 6%, for a total attorneys' fee of 30%.
[8] This is the date on which Snyderburn, as receiver, filed the motion asking the court to approve the Finley, Kumble/Kahn/Snyderburn fee arrangement.
[9] The waiver, which was handwritten, provided:

"I hereby waive any claim I may have to any contingency fee in Bantock, et al. v. Whittington, et al., pursuant to the Retainer Agreement dated March 16, 1987."
[10] This is the only one of the several waiver arguments raised by Snyderburn that we believe warrants discussion.
[11] We also reject Sacher/Kahn's claim that the entire fee agreement is invalid because Snyderburn perpetrated a fraud against them; we note that the lower court also did not embrace this claim. Sacher/Kahn's only other claim that they were harmed by Snyderburn's conduct is that they had to defend and defeat the disqualification. We specifically reject Sacher/Kahn's claim that having to obtain an order denying their disqualification constituted legal damage to them that would warrant cancellation of the entire fee agreement.